**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOHN WESLEY WILLIAMS,<br><br>  Plaintiff,<br><br>  v.<br><br>C. BELL, et al.,<br><br>  Defendants. | Case No. 1:16-cv-01584-NONE-SAB (PC)<br><br>FINDINGS AND RECOMMENDATION REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br>[ECF No. 82] |

Plaintiff John Wesley Williams is appearing pro se in this civil rights action pursuant to 42 U.S.C. § 1983.

Currently before the Court is Defendants' motion for summary judgment, filed April 12, 2019.

**I.**

**PROCEDURAL BACKGROUND**

This action is proceeding against Defendants C. Bell, S. Harris, R. Fischer, and Douglas for deliberate indifference to a serious medical need in violation of the Eighth Amendment.

Defendants filed an answer to the complaint on March 28, 2018. On March 29, 2018, the Court issued the discovery and scheduling order.

As previously stated, on April 12, 2019, Defendants filed a motion for summary judgment. Although the Court granted Plaintiff four generous extensions of time to file an opposition, Plaintiff

1

has failed to file an opposition and the time to do so has expired. Accordingly, Defendants' motion for summary judgment is deemed submitted, without oral argument. Local Rule 230(l).

## II.

## LEGAL STANDARD

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011). Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). The Court may consider other materials in the record not cited to by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

In judging the evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, Soremekun, 509 F.3d at 984 (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d at 942 (quotation marks and citation omitted).

## III.

## DISCUSSION

**A.    Summary of Plaintiff's Complaint**

Plaintiff is a participant in the California Department of Corrections and Rehabilitation mental health services delivery system (MHSDS). (Compl. at 3, ECF No. 1.) Department State Hospital (DSH) is required for prisoners who need MHSDS care and treatment in a hospital setting, while

2

Enhanced Outpatient (EOP) is a special program for prisoners who are gravely mentally disabled and unable to care for themselves in the general population. (Id.) Since early 2007, Plaintiff has received MHSDS care, treatment and services at the EOP level of care for what is commonly referred to as a "cutter." (Id. at 4.) A "cutter" is considered a serious psychiatric problem because although Plaintiff does not typically cut in a suicide attempt, but rather to relieve stress, anxiety, depression or anger. This type of cutting is more dangerous than a suicide attempt because the chances of accidental cuts may cause unintentional death. (Id.)

From approximately July 5, 2015 to August 6, 2015, Plaintiff was held in mental health crisis bed for suicide prevention due to his cutting behavior brought about by retaliatory harassment of prison officials at California State Prison-Lancaster because Plaintiff was assisting EOP attorneys to abolish discriminatory practices against EOP inmates at Lancaster. (Id. at 4-5.)

From August 6, 2015 to March 8, 2016, Plaintiff was held at DSH Stockton for treatment of his cutting disorder. (Id. at 5.) On March 8, 2016, Plaintiff was discharged from DSH to California State Prison-Sacramento EOP. On or about July 27, 2016, Plaintiff was interviewed by RBGG attorneys regarding discriminatory treatment and conditions at California State Prison-Sacramento. On or about August 16, 2016, as a direct result of the interview, Plaintiff was barred from EOP treatment by prison officials at Sacramento acting on behalf of CDCR, despite the fact that between June and August 2016, Plaintiff had cut himself 3-5 times. (Id. at 5.)

On September 7, 2016, Plaintiff arrived at California State Prison-Corcoran and was immediately placed in MHCB for suicide observation. (Id. at 5-6.)

On September 11, 2016, psychiatric technician J. Wadler conducted a mental health evaluation of Plaintiff which included a consult with custody officers supervising Plaintiff and determined it would be best to raise Plaintiff's MHSDS level of care to EOP. (Id. at 6.) Plaintiff attaches an Interdisciplinary Progress Note, dated September 11, 2016, regarding a "5 Day Follow Up" on which Wadler noted "MH evaluation for EOP status. C/Os were talked w im [sic] and agree this might be best for IP." (Id. at 13.)

///
///

On September 13, 2016, Plaintiff was evaluated by primary clinician social worker J. Gutknecht who initially endorsed Plaintiff for EOP. (Id. at 6.) However, on September 14, 2016, Plaintiff met with Gutknecht again who informed Plaintiff that Defendant Dr. Douglas stated "sending him to EOP will do no good because they'll only make him a ping pong by continuing to kick him out because nobody wants him." (Id.) Defendant Dr. Douglas then ordered Gutknecht not to refer Plaintiff to the appropriate level of MHSDS care to receive adequate care and treatment for his "cutting" disorder. (Id.) It is the general practice among CCCMS general population that MHSDS inmates demonstrates a sign of weakness and "cutters" like Plaintiff are "weirdos" who deserve to be "rolled up" to be placed in protective custody or impose physical harm. (Id. at 7.) This practice has discouraged Plaintiff from "coming forward to report or seek medical aid for incidents of cutting" since arriving at Corcoran. (Id.)

On September 14, 2016, Plaintiff filed an emergency grievance based on the present imminent danger of his "cutting" disorder. (Id.) On September 21, 2016, Defendant Psychologist Dr. Fischer interviewed Plaintiff, and Plaintiff revealed current and pre-existing cuts on his wrists inflicted between August and September 2016. (Id. at 7-8.) Plaintiff and Dr. Fischer also discussed the current general population prisoner practice and Plaintiff's discouragement to report injuries to medical staff. (Id. at 8.)

Because prison officials acting on behalf of CDCR do not want Plaintiff giving reports about EOP conditions to EOP attorneys, Defendants "acted in concert to deny Plaintiff adequate competent and effective mental health care and treatment to treat his cutting disorder." (Id.)

Plaintiff filed inmate grievance log number COR HC 16061128 regarding the allegations in the complaint. (Id. at 17-22.) The appeal was bypassed at the first level of review, and Plaintiff was interviewed by Defendant Dr. Fischer on September 21, 2016. (Id. at 21.) The appeal was partially granted at the second level of review in that the appeal was processed as an emergency, but denied as to Plaintiff's request to receive "EOP level of care due to imminent danger (cutting self)" by Defendants Harris (Chief Psychologist) and Bell (Chief Executive Officer) in September 2016. (Id. at 21-22.)

///

**B.     Statement of Undisputed Facts**

1.      At all times relevant, Plaintiff John Wesley Williams (V-34099) was an inmate in the custody of the California Department of Corrections and Rehabilitation (CDCR) incarcerated at California State Prison-Corcoran (Corcoran).  (Compl., ECF No. 1.)

2.      Plaintiff does not have any formal training in medicine, psychology, or psychiatry. (Chen Decl., Ex. 2, Pl.'s Dep., p. 38:16-21.)

3.      At all times relevant, Defendant Dr. Douglas was a Psychologist at Corcoran.  (Douglas Decl. ¶ 1.)

4.      At all times relevant, Defendant Dr. Fischer was a Psychologist Supervisor at Corcoran. (Fischer Decl. ¶ 1.)

5.      At all times relevant, Defendant Dr. Harris was Chief of Mental Health at Corcoran. (Harris Decl. ¶ 1.)

6.      At all times relevant, Defendant Bell was Chief Executive Officer (CEO) of medical services at Corcoran.  (Bell Decl. ¶ 1.)

7.      CDCR provides mental health treatment to inmates under the Mental Health Services Delivery System (MHSDS), which is governed by the Mental Health Treatment Program Guide ("program guide").  (Harris Decl. ¶ 3.)

8.      Mental health treatment is provided at four different levels of care, listed in order of lowest level of care to highest level of care: (1) Correctional Clinical Care Management Services (CCCMS); Enhanced Outpatient (EOP); Mental Health Crisis Bed Placement; and (4) Department State Hospital (DSH).  (Harris Decl. ¶ 4.)

9.      An inmate-patient's level of care is determined by an Interdisciplinary Treatment Team (IDTT), which is generally composed of a primary clinician, psychiatrist, correctional counselor, licensed psychiatric technicians, custody officers, and the inmate-patient.  Treatment plans are updated at least annually, whenever a change in level of care occurs, or when clinical judgment indicates the need for an update.  (Harris Decl. ¶ 5.)

///

///

10. CCCMS is the least restrictive level of care. The goal of the CCCMS is to maintain and/or improve adequate functioning of mentally disordered inmate-patients in the least restrictive treatment setting possible within each correctional setting. (Harris Decl. ¶ 6.)

11. Referrals to higher levels of care shall be considered when the inmate-patient's clinical condition has worsened or the inmate-patient is not benefitting from treatment services available at the current level of care. (Harris Decl. ¶ 7.)

12. EOP provides the most intensive level of outpatient mental health care within the MHSDS. The goal of the EOP is to provide focused evaluation and treatment of mental health conditions which are limiting an inmate's ability to adjust to placement in the General Population. The overall objective is to provide clinical intervention to return the individual to the least restrictive clinical and custodial environment. (Harris Decl. ¶ 8.)

13. Mental health treatment shall be provided as needed. Treatment is continued as needed, after review by an IDTT, for all cases in which mental health intervention is necessary to protect life and/or treat significant disability/dysfunction in an individual diagnosed with or suspected of having a mental disorder. Treatment is continued for these cases only upon reassessment and determination by the IDTT that the significant or life threatening disability/dysfunction continues or regularly occurs. (Harris Decl. ¶ 9.)

14. Inmate-patients whose level of functioning has improved significantly to the point where the structure of the EOP therapeutic and housing environment is no longer needed shall be referred to the CCCMS services available in Condemned Housing. (Harris Decl. ¶ 10.)

15. Inmate-patient progress is assessed by the Primary Clinician during regularly scheduled contacts. The frequency of these contacts shall vary based on clinical needs. Face to face individual contacts between the Primary Clinician and the CCCMS inmate-patient in a general population setting shall occur as often as clinical needs dictate but at least once every 90 days. (Harris Decl. ¶ 11.)

16. Plaintiff has been receiving mental health treatment within CDCR since about 2007. (Compl. at 4.)

17. Plaintiff admits that mental-health needs fluctuate and change based on how an individual is doing. (Pl.'s Dep. p. 31:21-23.)

6

18. Plaintiff received mental health treatment at the Department State Hospital (DSH) Stockton from about July 2015 to March 2016. (Fischer Decl. ¶ 5.)

19. Plaintiff was discharged from DSH Stockton and transferred to California State Prison-Sacramento (CSP-Sac) on or about March 9, 2016, and placed into the EOP level of care. (Fischer Decl. ¶ 6.)

20. On August 16, 2016, while incarcerated at CSP-Sac, Plaintiff's level of care was changed from EOP to CCCMS. (Fischer Decl. ¶ 7.)

21. On August 31, 2016, while incarcerated at CSP-Sac, another level of care decision was made, retaining Plaintiff at the CCCMS level. (Fischer Decl. ¶ 8.)

22. In September 2016, Plaintiff arrived at Corcoran, the location of the alleged events. (Pl.'s Dep., p. 40:8-10.)

23. On September 8, 2016, while incarcerated at Corcoran, Plaintiff was referred to Mental Health Crisis Bed (MHCB) due to a medical report dated September 7, 2016, where Plaintiff stated he was suicidal. (Fischer Decl. ¶ 9.)

24. A suicide risk evaluation was conducted on Plaintiff on September 8, 2016. (Fischer Decl. ¶ 10.)

25. Plaintiff was released from MHCB the next day on September 9, 2016, because he refused to talk to his provider during the intake interview. It is further noted that Plaintiff "has a history of using MHCB inappropriately spending a couple of days 'to de-stress.'" The provider explained to Plaintiff that if he continued to refuse to talk to him, he would have no information to support his stay in MHCB. Plaintiff stated, "Do what you need to do," pulled his blanket down, and went back to sleep. Plaintiff was returned to general population housing with a five-day follow-up to ensure his safety. (Fischer Decl. ¶ 11.)

26. Plaintiff was seen each day for the next five days from September 10, 2016, to September 14, 2016, for his 5-day follow up. Plaintiff was seen by Psychiatric Technician Waller the first two days, and he was seen by Dr. Gutknecht the last three days. (Fischer Decl. ¶ 12.)

27. Another suicide risk evaluation was conducted on Plaintiff on September 15, 2016. (Fischer Decl. ¶ 14.)

28. On September 15, 2016, Plaintiff was seen by his Primary Clinician Dr. Gutknecht. During this contact, Plaintiff agreed to see Dr. Gutknecht weekly. Dr. Gutknecht noted "Will take to IDTT and recommend no change for LOC." (Fischer Decl. ¶ 15.)

29. An IDTT was held on September 20, 2016, during which Plaintiff was present. The IDTT members present included Dr. Gutknecht, Psychiatrist Dr. Torry, Correctional Counselor I Alvarado, and Dr. Stokes. The IDTT made the determination to continue Plaintiff at the CCCMS level of care. (Fischer Decl. ¶ 16.)

30. None of the Defendants were on Plaintiff's treatment team. (Id.; see also Pl.'s Dep. p. 62:6-12.)

31. On September 14, 2016, Plaintiff submitted an inmate health care appeal (log number COR HC 16002225) in which he complained that his "social worker informed [him] that supervising psychologist overturned his initial recommendation to raise level of care to EOP to receive group and individual therapy for cutting disorder." Plaintiff stated in the appeal that "supervising psychologist purport that sending [him] to EOP will do no good because they'll only make [him] a ping pong by continuing to kick [him[ out because nobody wants him." Finally, Plaintiff stated in the appeal that the "supervising psychologist act in concert and conspiracy to not only deprive [him] of adequate and competent care." (Fischer Decl. ¶ 13.)

32. Dr. Fischer interviewed Plaintiff on September 21, 2016, regarding health care appeal log number COR HC 16002225. (Fischer Decl. ¶ 17.)

33. Dr. Fischer completed a progress note documenting his September 21, 2016 interview with Plaintiff. In the subjective portion of the note, Dr. Fischer noted as follows: "His mental health issues were addressed, including his desire to be made EOP and have more treatment. He had previously been COP and DSH for depression and cutting. He wants the same level of attention that he had previously, including groups for 'cutters.' He is not suicidal but does the cutting because it is 'soothing and provides a release.' In the Plan portion of the note, Dr. Fischer noted as follows: "Dr. Gutknecht has agreed to see him weekly for awhile and continually re-evaluate his level of care. He may also start a small group on 3A facility." (Fischer Decl. ¶ 19.)

///

34. The appeal was bypassed at the first level of review. The appeal was granted in part and denied in part at the second level of review. The appeal was granted in that the appeal was processed as an emergency appeal. The appeal was denied in that Plaintiff's request to receive mental health treatment at a higher level of care was denied. The reasoning provided to Plaintiff in the appeal response was:

> You were at DSH for about nine months and you were also at EOP level of care before being downgraded to CCCMS level of care at another institution. You are requesting more mental health services including groups, if available. You have been meeting with Dr. Gutknecht on 3A facility and he agreed to meet with you weekly, instead of every 90 days, to provide additional counseling services. He will also be starting a small group on 3A, for which you will be eligible. You have been given counsel [sic] on dealing with your cutting behavior. Your level of care will be evaluated on an ongoing basis.

(Fischer Decl. ¶ 18.)

35. Defendant Harris signed the second level response. (Harris Decl. ¶ 12.)

36. Plaintiff has never spoken to Defendant Harris, and other than Defendant Harris's role as a supervisor, Plaintiff has no other basis for suing Defendant Harris. (Pl.'s Dep. at 76:10-14; 78:3-5.)

37. Defendant Bell did not sign the second level response; however, it was signed by someone else on her behalf. (Bell Decl. ¶ 3.)

38. Plaintiff has never met Defendant Bell, and other than Defendant Bell's role as a supervisor, Plaintiff has no other basis for suing Defendant Bell. (Pl.'s Dep. at 78:6-10, 22-25.)

39. Dr. Douglas provided clinical supervision to Plaintiff's Primary Clinician Dr. Gutknecht, in order for Dr. Gutknecht to obtain his supervised professional experience hours required for licensure as a psychologist by the California Board of Psychology. (Douglas Decl. ¶ 2.)

40. In her capacity as Dr. Gutknecht's clinical supervisor, Dr. Douglas met with Dr. Gutknecht on a weekly basis to discuss Dr. Gutknecht's clinical patients' presentations. The meetings were informal, and Dr. Douglas did not keep notes during the weekly discussion. (Douglas Decl. ¶ 4.)

41. Dr. Douglas does not recall the specifics of the discussions she had with Dr. Gutknecht regarding inmate Williams, but her overall recollection is that Dr. Gutknecht did not believe inmate Williams needed mental health treatment at a higher level of care but struggled with how to convey

this to inmate Williams, who desired a higher level of care. Dr. Douglas expressed to Dr. Gutknecht that he should talk to his administrative supervisor Dr. Fischer (who Dr. Gutknecht reported to directly) and the Interdisciplinary Treatment Team (IDTT) (who make level of care decisions) regarding concerns about Williams' level of care. (Douglas Decl. ¶ 7.)

42. Dr. Douglas have the authority to order Dr. Gutknecht to make, or refrain from making, changes to Plaintiff's mental health level of care. (Douglas Decl. ¶ 9.)

43. Dr. Douglas did not have authority to make decisions regarding Plaintiff's mental health treatment including level of care decisions, as Plaintiff was not Dr. Douglas's patient, and Dr. Douglas was not Plaintiff's provider. (Douglas Decl. ¶ 10.)

44. Dr. Douglas did not have the authority to unilaterally change an inmate's level of care, as level of care decisions are made by an IDTT, and Dr. Douglas was not a part of Plaintiff's IDTT. (Douglas Decl. ¶ 11.)

### C. Analysis of Defendants' Motion

Defendants do not dispute that Plaintiff's mental health treatment is a serious medical need. Defendants argue, however, that Plaintiff's level of care was not Defendants' decision. Rather, an inmate-patient's level of care is determined by an Interdisciplinary Treatment Team (IDTT), made up of mental health and custody staff. None of the Defendants were on Plaintiff's treatment team. Moreover, Plaintiff's level of care was downgraded from EOP to CCCMS, while he was incarcerated at another prison, and when he arrived at Corcoran, his mental health needs were evaluated and a decision was made by his treatment team, of which Defendants did not take part.

A district court may only consider admissible evidence in ruling on a motion for summary judgment. See Fed. R. Civ. P. 56(e); Orr v. Bank of America, 285 F.3d 764, 773 (9th Cir. 2002). In support of their motion for summary judgment, Defendants have presented their own declarations as well as a declaration from their attorney, Janet Chen, along with various supporting exhibits. Plaintiff has filed a verified complaint, but he did not file an opposition. The Court construes Plaintiff's complaint as an affidavit under Federal Rule of Civil Procedure 56, insofar as it is based on personal knowledge and sets forth specific facts admissible in evidence. See Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995).

While the Eighth Amendment of the United States Constitution entitles Plaintiff to medical care, the Eighth Amendment is violated only when a prison official acts with deliberate indifference to an inmate's serious medical needs. Snow v. McDaniel, 681 F.3d 978, 985 (9th Cir. 2012), overruled in part on other grounds, Peralta v. Dillard, 744 F.3d 1076, 1082-83 (9th Cir. 2014); Wilhelm, 680 F.3d at 1113; Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006). Plaintiff "must show (1) a serious medical need by demonstrating that failure to treat [his] condition could result in further significant injury or the unnecessary and wanton infliction of pain," and (2) that "the defendant's response to the need was deliberately indifferent." Wilhelm, 680 F.3d at 1122 (citing Jett, 439 F.3d at 1096). The requisite state of mind is one of subjective recklessness, which entails more than ordinary lack of due care. Snow, 681 F.3d at 985 (citation and quotation marks omitted); Wilhelm, 680 F.3d at 1122.

"A difference of opinion between a physician and the prisoner – or between medical professionals – concerning what medical care is appropriate does not amount to deliberate indifference." Snow, 681 F.3d at 987 (citing Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989), overruled in part on other grounds, Peralta, 744 F.3d at 1082-83; Wilhelm, 680 F.3d at 1122-23 (citing Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1986). Rather, Plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that the defendants chose this course in conscious disregard of an excessive risk to [his] health." Snow, 681 F.3d at 988 (citing Jackson, 90 F.3d at 332) (internal quotation marks omitted).

1. Defendant Fischer

Plaintiff submitted an inmate health care appeal requesting a high level of care. Dr. Fischer interviewed Plaintiff on September 21, 2016, regarding the appeal, and noted the following:

> His mental health issues were addressed, including his desire to be made EOP and have more treatment. He had previously been EOP and at DSH for depression and cutting. He wants the same level of attention that he had previously, including groups for "cutters." He is not suicidal but does the cutting because it is "soothing and provides a release."

(Chen Decl. Ex. O, ECF No. 82-4.) Dr. Fischer also noted that Plaintiff's primary clinician Dr. Gutknecht agreed to see him weekly for awhile and to continually re-evaluate his level of care.

Therefore, Plaintiff's request for a higher level of care was denied and Plaintiff was advised as follows:

> [y]ou were at DSH for about nine months and you were also at EOP level of care before being downgraded to CCCMS level of care at another institution. You are requesting more mental health services including groups, if available. You have been meeting with Dr. Gutknecht on 3A facility and he agreed to meet with you weekly, instead of every 90 days, to provide additional counseling services. He will also be starting a small group on 3A, for which you will be eligible. You have been given counsel [sic] on dealing with cutting behavior. Your level of care will be evaluated on an ongoing basis.

(Fischer Decl. ¶ 18.)

In general, liability is not imposed on a medical professional who only reviewed and denied an inmate appeal. See, e.g., Vasquez v. Tate, No. 1:10-cv-01876-JLT, 2013 WL 1790143, at *8 (E.D. Cal. Apr. 26, 2013), citing Koch v. Neubarth, No. 1:09-cv-001116-SMS, 2009 WL 4019616, at *5 (E.D. Cal. Nov. 18, 2009). However, "a medically-trained individual who is made aware of serious medical needs through reviewing a prisoner's appeal may be liable for failure to treat those needs." Rapalo v. Lopez, No. 1:11-cv-01695-LJO-BAM, 2017 WL 931822, at *17 (E.D. Cal. Mar. 9, 2017); see also Pogue v. Igbinosa, No. 1:07-cv-01577-GMS, 2012 WL 603230, at *9 (E.D. Cal. Feb. 23, 2012) ("emerging consensus, therefore, is that a medically-trained official who reviews and denies an appeal is liable under the Eighth Amendment when a plaintiff can show that the official knew, at least in part, from reading the appeal that the plaintiff had a serious medical issue and nevertheless chose not to offer treatment").

Plaintiff has failed to present evidence that Dr. Fischer knew of and disregarded an excessive risk to his safety by denying him EOP level of care. Dr. Fischer interviewed Plaintiff and addressed his grievance which was processed as an emergency appeal. Dr. Fischer in his review noted that Plaintiff requested a higher level of treatment, but noted that he was previously at DSH for nine months and he was at an EOP level of care before being downgraded to CCCMS at a prior institution. Dr. Fischer may rely on those medical determinations relating to the appropriate level of care. See, e.g., Garrett v. Haar, No. CV 16-9668-CAS (JPR), 2017 WL 5634612, at *4 (C.D. Cal. Oct. 13, 2017) (reviewer did not "consciously disregard an excessive risk to Plaintiff's health by relying on [prior]

medical assessments"). Dr. Fischer also noted that Dr. Gutknecht was meeting with Plaintiff regularly and agreed to meet with Plaintiff on a weekly basis, instead of every 90 days. Dr. Fischer also noted that Plaintiff eligible to attend small group sessions, he was advised on how to deal with cutting behavior, and he would continue to be evaluated on an ongoing basis. While Plaintiff may not have agreed with Dr. Fischer's determination, such claim, at best, amounts to a difference of medical opinion regarding the appropriate course of treatment, which does not support a finding of deliberate indifference. Sanchez, 891 F.2d at 242. Based on the record, the Court finds that no rational trier of fact would find that placing Plaintiff at the CCCMS level of care was medically unacceptable under the circumstances, and Dr. Fischer should be granted summary judgment.

### 2. Defendant Harris

Dr. Harris, as Chief of Mental Health, only reviewed and signed Plaintiff's inmate appeal at the second level of review. Plaintiff has never spoken to Dr. Harris, and admits that other than Dr. Harris's role as supervisor, Plaintiff has no other basis for suing Dr. Harris. (Pl.'s Dep. at 76:10-14; 78:3-5.)

Dr. Harris reviewed Plaintiff's level of care decision and mental health treatment plan on August 16, 2016, when Plaintiff's level of care was downgraded from EOP to CCCMS, while Plaintiff was housed at California State Prison, Sacramento. (Fischer Decl. ¶ 7.) The treatment plan advised that Plaintiff:

> will be accepted into the CCCMS program at this time. IP has been assessed and evaluated for a lower level of care at this time due to meeting treatment goals. IP is ready for a lower level of care due to his decrease in depressive symptoms and no report of anxiety, as well as his threats of SIB are volitional in nature and are for secondary gains rather that [sic] genuine mental health symptomology. He has had medication compliance. He has had an increase coping skills and the ability to express himself, and has stated he "knows the coping skills not to cut, but does not want to use them." IP can continue goals of working on reducing depression, as well as finding motivation to reduce SIB at a lower level of care. No ongoing recent/current medically serious SIB. Low imminent self-harm risk based on foregoing, lack of credible threats and MSE. Low acute risk of harming/killing himself as there has been no documented history of a near lethal attempt in records reviewed or current SIB. Also, denied means, plan & there has been no evidence of intent, effort to conceal, excessive guilt, CAH hallucinations, severe anxiety/panic or intoxication/withdrawal. As there has been no evidence of medically serious SIB or history of the same he is estimated low risk for unintentionally killing

13

himself.

(Harris Decl. ¶ 19, ECF No. 82-7.)

Plaintiff fails to demonstrate that Defendant Dr. Harris was deliberately indifferent to a substantial risk of harm by denying Plaintiff's appeal at the second level of review. Plaintiff's appeal, without more, was insufficient to put Defendant Dr. Harris on notice that it was medically necessary for Plaintiff to remain at the EOP level of care. Indeed, Dr. Harris reasonably relied on the professional medical judgment of his staff in rendering his decision at the second level of review. See, e.g., Peralta v. Dillard, 744 F.3d at 1086-87 (prison officials serving in administrative roles are not deliberately indifferent when they rely on the opinions of qualified medical staff in responding to a plaintiff's medical grievance); Doyle v. Cal. Dep't of Corr. & Rehab., No. 12-cv-2769-YGR, 2015 WL 5590728, at *9 (N.D. Cal. Sept. 23, 2015) (defendants who served in an administrative capacity and relied on expertise of physician and medically trained clinicians when resolving inmate grievance did not amount to deliberate indifference). There are no allegations, beyond review of the inmate appeal, that Dr. Harris, Chief of Mental Health, was personally involved in Plaintiff's treatment, and Dr. Harris's involvement is limited to Plaintiff filing a grievance describing his mental conditions. Accordingly, it simply cannot be said that, by signing off on the denial of the appeal at the second level of review, Dr. Harris disregarded a substantial risk of harm to Plaintiff's safety.

3.  Defendant Bell

Defendant Bell is the CEO of medical services. As CEO, she is responsible for reviewing and signing the second (or final) level institutional response to inmate health care appeals. (Bell Decl. ¶ 2, ECF No. 82-8.) Bell reviewed Plaintiff's health care appeal log number COR HC 16002225, in which Plaintiff requested mental health treatment at a higher level of care. Although Bell's name appears at the bottom of the second level response, Bell did not review or sign the appeal, as it was reviewed and signed by someone on Bell's behalf. (Bell Decl. ¶ 3, Harris Decl. Ex. A; ECF No. 82-7.) Bell did not draft or prepare the response, and Bell has no medical or mental health training. (Bell Decl. ¶¶ 4-5.) Indeed, in rendering a decision on a medical appeal, Bell relies on the medical and mental health expertise of staff regarding the issues. (Bell Decl. ¶ 6.); See, e.g., Peralta v. Dillard, 744 F.3d at 1086-

87 (prison officials serving in administrative roles are not deliberately indifferent when they rely on the opinions of qualified medical staff in responding to a plaintiff's medical grievance); Doyle v. Cal. Dep't of Corr. & Rehab., 2015 WL 5590728, at *9 (defendants who served in an administrative capacity and relied on expertise of physician and medically trained clinicians when resolving inmate grievance did not amount to deliberate indifference). There are no allegations that Bell, as CEO of medical services, was personally involved in Plaintiff's treatment, and Bell's involvement is limited to Plaintiff filing a grievance describing his mental conditions. Accordingly, it simply cannot be said that Bell disregarded a substantial risk of harm to Plaintiff's safety.

4. Defendant Douglas

Plaintiff contends that Dr. Douglas ordered his primary clinician Dr. Gutknecht not to refer him to the EOP level of care, apparently because did not believe it would be beneficial. (Compl., ECF No. 1 at 6.)

Dr. Douglas did provide clinical supervision over Plaintiff's primary care clinician Dr. Gutknecht, which allowed Dr. Gutknecht to obtain his supervised professional experience hours required for licensure by the California Board of Psychology. (Douglas Decl. ¶ 2.) Dr. Douglas met with Dr. Gutknecht on a weekly basis to discuss Dr. Gutknecht's patients' presentations. (Douglas Decl. ¶ 4.) Dr. Douglas recalls expressing to Dr. Gutknecht that he should talk to his administrative supervisor Dr. Fischer (who Dr. Gutknecht reported to directly) and the IDTT (who make level of care decisions) regarding concerns about Plaintiff's level of care. (Douglas Decl. ¶ 7.)

Although Plaintiff contends that Dr. Douglas told Dr. Gutknecht that he would not benefit from EOP, there are no further allegations that Plaintiff was not provided EOP placement due to the alleged statement by Dr. Douglas. Plaintiff was DSH for nine months and EOP before downgraded to CCCMS at another institution prior to his transfer to Corcoran State Prison, and Plaintiff admits that mental-health needs fluctuate and change based on how an individual is doing. (Pl.'s Dep. p. 31:21-23.) It is undisputed that since his arrival at Corcoran, Plaintiff has been provided regular, ongoing access to mental health professional. (Fischer Decl. ¶¶ 9-15.) As previously stated, Dr. Gutknecht was meeting with Plaintiff regularly and agreed to meet with Plaintiff on a weekly basis, instead of every 90 days. Moreover, even if it is assumed Dr. Douglas made the alleged statement, it does not create a genuine

15

issue of material fact because it is undisputed that there was an independent evaluation and review by other medical professionals. It is also undisputed that Dr. Douglas does not have the authority to make, or refrain from making, changes to Plaintiff's mental health level of care. It is further undisputed that Dr. Douglas did not have authority to make decisions regarding Plaintiff's mental health treatment including level of care decisions, as Plaintiff was not Dr. Douglas's patient, and Dr. Douglas was not Plaintiff's provider. In addition, it is undisputed that level of care decisions is made by a treatment team, and Dr. Douglas was not even a member of Plaintiff's treatment team. Accordingly, the Court finds that Dr. Douglas is entitled to summary judgment.

## IV.
## RECOMMENDATIONS

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. Defendants' motion for summary judgment be granted; and
2. Judgment be entered in favor of all Defendants.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within **thirty (30) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: **April 7, 2020**

UNITED STATES MAGISTRATE JUDGE

16